JDN

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Marcus Lee Luster,

          Plaintiff,

v.

Pima County, et al.,

          Defendants.

No. CV-22-00519-TUC-RM

**ORDER**

    Plaintiff Marcus Lee Luster, who is currently confined in the Arizona State Prison Complex, Browning Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against Pima County Sergeants Perko, Reidy, and Pina, and Officer Krause.  (Doc. 1.) Before the Court are Defendants Reidy's and Pina's separate Motions for Summary Judgment (Docs. 56, 58), Plaintiff's Motion for Summary Judgment (Doc. 83), and Plaintiff's Motion for Oral Argument (Doc. 97).[1]  The Court will deny all Motions.

## I.    Background

    Plaintiff's claims arose during his confinement in the Pima County Adult Detention Complex.  (Doc. 1 at 1.)  Plaintiff alleged that, on August 18, 2022, Defendants Perko and Reidy refused to take any action to treat him after he lost consciousness, fell, and hit his head.  (*Id.* at 3.)  Plaintiff alleged that, on August 15, 2022, Defendant Krause refused to

---

[1] Also before the Court are Plaintiff's Motion to Charge Defendant Pina and Lieutenant Black with Conspiracy (Doc. 96), Motion for Appointment of Counsel (Doc. 99), Motion to Supplement (Doc. 103), Motion to Compel (Doc. 106), and Motion for Interrogatories (Doc. 107), which the Court will address in separate orders.

assist Plaintiff, who was in handcuffs and shackles, with dialing the telephone to call his attorney.  (*Id.* at 9.)  Therefore, with Defendant Krause's encouragement, Plaintiff stood on a chair to try to dial the telephone, but he fell off and suffered injuries that required him to be hospitalized.  (*Id.*)  Plaintiff alleged that, on July 11, 2022, Defendant Pina used excessive force by ordering Plaintiff to be placed on a restraint board for two hours even though Plaintiff agreed to comply with all directives.  (*Id.* at 11.)

Upon screening, the Court determined that Plaintiff adequately stated a Fourteenth Amendment medical claim in Count One against Defendants Perko and Reidy, a Fourteenth Amendment failure to protect claim in Count Two against Defendant Krause, and a Fourteenth Amendment excessive force claim in Count Three against Defendant Pina.  (Doc. 9.)

On February 6, 2024, Defendant Reidy filed a Motion for Summary Judgment as to Count One, and Defendant Pina filed a Motion for Summary Judgment as to Count Three. (Docs. 56, 58.)

On March 19, 2024, Plaintiff filed a Motion for Summary Judgment as to Count Three against Defendant Pina.  (Doc. 83.)

On June 27, 2024, Plaintiff filed a Motion for Summary Judgement—Oral Argument Requested.  (Doc. 97.)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the

1    nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact
2    in contention is material, i.e., a fact that might affect the outcome of the suit under the
3    governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a
4    reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*,
5    477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216,
6    1221 (9th Cir. 1995).   The nonmovant need not establish a material issue of fact
7    conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–
8    89 (1968); however, it must "come forward with specific facts showing that there is a
9    genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,
10   587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

11         At summary judgment, the judge's function is not to weigh the evidence and
12   determine the truth but to determine whether there is a genuine issue for trial. *Anderson*,
13   477 U.S. at 249.  In its analysis, the court does not make credibility determinations; it must
14   believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at
15   255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  The court need
16   consider only the cited materials, but it may consider any other materials in the record.
17   Fed. R. Civ. P. 56(c)(3).  Where the nonmovant is a pro se litigant, the court must consider
18   as evidence in opposition to summary judgment all of the nonmovant's contentions set
19   forth in a verified complaint or motion. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

20   **III.    Plaintiff's Motion for Summary Judgment—Oral Argument Requested**

21         In his three-page Motion, Plaintiff requests summary judgment based on
22   Defendants' and defense counsel's lies or, in the alternative, that the trial date be moved to
23   the end of September 2024.  (Doc. 97 at 1.)  Plaintiff also includes a renewed request for
24   appointment of counsel.  (*Id.* at 2.)  Defendants oppose Plaintiff's Motion.  (Doc. 100.)

25         Plaintiff does not present any evidence to support his claim that Defendants or
26   defense counsel have lied to the Court, nor does Plaintiff's Motion conform to the Federal
27   and Local Rules of Procedure governing summary judgment motions.

28         At this stage, although summary judgment will be denied, it is premature to set a

trial date. The Court will set a trial date after the parties have filed their Joint Proposed Pretrial Order.

The request for counsel embedded in Plaintiff's Motion for Summary Judgment—Oral Argument Requested is duplicative of the request for counsel made in Plaintiff's Motion for Appointment of Counsel (Doc. 99). The Court will resolve the request for counsel in a separate Order addressing the Motion for Appointment of Counsel.

For these reasons, Plaintiff's Motion for Summary Judgment—Oral Argument Requested will be denied.

## IV.   Count One—Medical Care Claim

### A.   Legal Standard

Under Ninth Circuit law, "claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)). Under this standard, a plaintiff must show that the denial, delay, or otherwise unreasonable course of medical care was taken in "reckless disregard" of an excessive risk to the plaintiff's health or safety. *Id.* at 1125. Unlike in the Eighth Amendment that applies to convicted prisoners, where a showing of subjective deliberate indifference is required, a pretrial detainee plaintiff need not show subjective intent on the part of medical providers to establish a constitutional violation. *Id.* at 1125.

The elements of a pretrial detainee's medical care claim against an individual defendant are:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (ii) those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (iii) the defendant did not take reasonable available measures to abate the risk, even though a reasonable official in the circumstances would have

appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Id.* (quoting *Castro*, 833 F.3d at 1071).

### B. Relevant Facts

On August 17, 2022, Plaintiff was released from Banner Hospital after treatment for a fall. (Doc. 1 at 5.) Plaintiff was diagnosed with right hemiparesis paralysis and hypoesthesia of the right side. (*Id.*) Plaintiff's medical records advised that, if he falls again or loses consciousness, he should return to the emergency room immediately or call 9-1-1. (*Id.* at 6.) Upon release, Plaintiff returned to the Pima Adult Detention Center. (*See id.* at 5–6.)

On August 18, 2022, sometime between 2:00 a.m. and 4:00 a.m., Plaintiff fell in his cell, hit his head, and went unconscious. (*Id.* at 5.) The fall caused paralysis on Plaintiff's right side. (Doc. 80, Pl. Decl. ¶ 2.) Officer Gallegos contacted Nurse Thomas, who came to Plaintiff's cell, told Plaintiff he was faking, and said that it was Plaintiff's left side that was treated at the hospital. (Doc. 1 at 5.) Nurse Thomas told Officer Gallegos and Plaintiff that she would call the provider to ask if Plaintiff should be sent to the hospital. (*Id.*) Nurse Thomas did not return in the next hour, so Officer Gallegos called Nurse Thomas. (*Id.*)

Nurse Thomas came back to Plaintiff's cell with Sergeant Perko and Defendant Reidy. (*Id.*) Both Nurse Thomas and Sergeant Perko said that they didn't care if Plaintiff died, and they were not going to do anything. (*Id.* at 5–6.) Both Thomas and Perko used vulgarities and made racist comments to Plaintiff. (*Id.* at 6; Doc. 80 at 2, Pl. Decl. ¶ 3.) Defendant Reidy heard Thomas and Perko say these comments to Plaintiff. (Doc. 80 at 2, Pl. Decl. ¶ 3.) The three staff members entered Plaintiff's cell, where Nurse Thomas took Plaintiff's blood pressure and lifted Plaintiff's right arm, but that was the extent of her evaluation. (*Id.*) Defendant Reidy observed the entire medical evaluation, during which Plaintiff was alert and conscious. (Doc. 59-1 at 3, Reidy Decl. ¶¶ 5–6, 7, 9.) Nurse Thomas

told Plaintiff that she would call the provider again.  (Doc. 1 at 6.)  Defendant Reidy avers that Nurse Thomas told him no further medical care was necessary.  (Doc. 59-1 at 3, Reidy Decl. ¶ 8.)

Nurse Thomas then left and did not return to check on Plaintiff, nor did any other medical staff check on Plaintiff.  (*Id.*)  Plaintiff remained lying on his cell floor unable to move for approximately eight hours.  (*Id.*)  During this time, he was forced to urinate on himself, suffered physical pain, and had no access to water.  (*Id.*)  Plaintiff endured mental trauma and thought he was going to die.  (*Id.*)

The next day, Plaintiff saw Psych staff member Katie, who informed Plaintiff that Nurse Thomas did not make any notations in Plaintiff's medical record about seeing Plaintiff or calling the provider the previous night.  (*Id.*)[2]

Since the August 18, 2022 fall, Plaintiff has suffered permanent numbness in his left leg.  (Doc. 1 at 6.)

**C.    Discussion**

Construing the facts in Plaintiff's favor, Defendant Reidy made an intentional decision regarding Plaintiff's medical care and conditions of confinement when he chose to take no action after the encounter in Plaintiff's cell with Nurse Thomas even though Plaintiff was lying on the floor unable to move.  Thus, the first element of Plaintiff's medical care claim is met.  *See Castro*, 833 F.3d at 1070 (noting that this first element would not be satisfied only if the defendant's conduct resulted from something totally unintentional, such as an accident).

The second element considers whether Plaintiff faced a substantial risk of suffering serious harm.  This element is "purely objective."  *Id.*  Plaintiff alleges that he was lying on the floor unable to move when Defendant Reidy—along with Nurse Thomas and Sergeant Peko—left his cell.  Plaintiff remained on the floor for eight hours, during which time no one checked on him, he urinated on himself, he lacked access to water, and he

---

[2] Nurse Thomas was originally named as a Defendant; however, she was dismissed in May 2024 for failure to serve.  (Docs. 93.)

suffered physical pain and mental trauma.  In these conditions, Plaintiff faced a substantial risk of suffering serious harm.  *See Nickson v. Cole*, No: 9:18-CV-172, 2023 WL 3911932, at *3, 5 (E.D. Tex. Mar. 14, 2023) (finding that it was clear pretrial detainee had a serious medical need where he was lying on the floor in his cell, unable to sit up or move, he appeared dizzy, he had urinated on himself, and he appeared to have no control over his upper body); *Cruz v. Cunningham*¸ No. 3:18-CV-1321-MAB, 2022 WL 1555371, at *17 (S.D. Ill. May 17, 2022) (denying summary judgment to defendants in Eighth Amendment medical care case where prisoner plaintiff was unable to move because of back pain and prison officials delayed treatment for one-and-a-half hours, which caused unnecessary suffering); *Perry v. Bone*, No. 1:19-CV-WKW, 2020 WL 1181528, at *3 (M.D. Ala. Mar. 11, 2020) (finding plaintiff's serious medical need was obvious to a lay person where, after a motorcycle accident, the plaintiff was unable to move when he gained consciousness; thus, an officer's failure to provide emergency medical care in the situation supports that the officer disregarded a risk of serious harm to the plaintiff).

Under the third element, the plaintiff must demonstrate that the defendant's actions were "objectively unreasonable," which requires a showing of "more than negligence but less than subjective intent—something akin to reckless disregard."  *Gordon*, 888 F.3d at 1125.  Defendant Reidy argues that he is not a medical professional; rather, he simply accompanied Nurse Thomas to Plaintiff's cell and observed the medical evaluation.  (Doc. 58 at 6.)  Defendant Reidy states that he did not attempt to get Plaintiff additional medical care following the encounter with Nurse Thomas because he believed that Nurse Thomas had already evaluated Plaintiff and made a determination that no further medical care was necessary, and he "did not personally observe anything that would lead him to question her assessment."  (*Id.* at 5–6.)

Non-medical personnel may rely on the medical opinions of health care professionals unless "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner."  *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (internal quotation marks omitted).  Thus, if "a

1  reasonable person would likely determine [the medical treatment] to be inferior," the fact

2  that an official is not medically trained will not shield that official from liability for

3  deliberate indifference." *Caplinger v. CCA*, 999 F. Supp. 2d 1203, 1214 (D. Idaho 2014).

4  According to Plaintiff's supported facts, which must be taken as true, Defendant

5  Reidy heard Nurse Thomas say to Plaintiff that she did not care if he died, and she was not

6  going to do anything. Defendant Reidy also heard Nurse Thomas make racist comments

7  to Plaintiff, and he watched her conduct a very cursory evaluation. A reasonable jury could

8  believe these facts and find reason to question Nurse Thomas's assessment. A jury could

9  determine Defendant Reidy knew Nurse Thomas was mistreating Plaintiff and that her

10  conclusion that no further medical care was necessary was unreasonable, given that

11  Plaintiff was lying on the floor of his cell, unable to move.

12  The cases on which Defendant Reidy relies are not analogous and fail to support his

13  argument against liability. In *Spruill v. Gillis*, the prisoner plaintiff sued two prison

14  medical staff members as well as a non-medical lieutenant for deliberate indifference to

15  his serious back condition, which was untreated or inadequately treated, resulting in

16  excruciating pain. 372 F.3d 218, 222 (3d Cir. 2004). After the plaintiff arrived at a new

17  facility, he reported severe back and leg pain, and he was interviewed by a nurse, who

18  informed him he needed to sign up for sick call, which he did the following day. *Id.* at 224.

19  The next morning, due to his severe pain, the plaintiff fell and struck his head on the toilet.

20  *Id.* The plaintiff informed the nurse of his fall and additional injuries, and she told the

21  plaintiff she would inform the doctor. *Id.* The plaintiff also informed the defendant

22  lieutenant of his fall, to which the lieutenant said, "so, what do you want me to do?" *Id.*

23  The defendant lieutenant did not inform medical staff of the plaintiff's fall, and the

24  plaintiff did not see the doctor until the next day. *Id.* The Third Circuit determined that

25  the plaintiff failed to state a claim against the defendant lieutenant because, at the time the

26  lieutenant spoke to the plaintiff, the plaintiff had already seen a nurse and thus was

27  receiving a minimal measure of medical attention. *Id.* at 237. "If a prisoner is under the

28  care of medical experts, . . . a non-medical prison official will generally be justified in

believing that the prisoner is in capable hands." *Id.* at 236. Further, the plaintiff did not allege facts from which to infer that his condition was so dire and obvious that the lieutenant's failure to summon immediate medical attention when they spoke amounted to deliberate indifference. *Id.* at 237. Thus, the Third Circuit found the plaintiff's facts simply did not amount to "examples of deny[ing] reasonable requests for medical treatment . . . expos[ing] the inmate to undue suffering or knowledge of the need for medical care coupled with an intentional refusal to provide that care." *Id.* at 236 (internal quotations omitted).

Conversely, here, the Court determined through screening that Plaintiff has stated a claim against Defendant Reidy based on his allegations that (1) Defendant Reidy was present at the interaction with Nurse Thomas; (2) Defendant Reidy was aware of Nurse Thomas's derogative statements to Plaintiff, including that she didn't care about him and was not going to do anything; and (3) Defendant Reidy was aware of Nurse Thomas's insufficient evaluation of Plaintiff. Plaintiff also alleges that, at the time, he was lying on the floor of his cell, unable to move. From these allegations, it may be inferred that Plaintiff's serious condition was obvious to Defendant Reidy. A reasonable jury could find these facts show Defendant Reidy was aware of Plaintiff's "need for medical care," and his failure to act equated to "an intentional refusal to provide that care." *Id.*

In *Keith v. DeKalb County, Georgia*, a pretrial detainee named Cook was murdered by his cellmate while they were housed in a pod designated for mental health detainees who did not present a risk of harm to themselves or others. 749 F.3d 1034, 1039–43 (11th Cir. 2014). The jail's mental health staff conducted mental health risk assessments and determined where detainees with mental health problems should be housed. *Id.* at 1040. The administrator of Cook's estate sued the sheriff based on his supervisory position and for an alleged deliberately indifferent policy that failed to separate detainees who had committed violent crimes—like Cook's cellmate—from those who had not—like Cook. *Id.* at 1047–48. The Eleventh Circuit noted the plaintiff did not allege that the sheriff personally participated in the alleged constitutional violations; therefore, the plaintiff had

to show that the sheriff failed to correct a widespread pattern of constitutional violations or that he adopted a policy that deprived Cook of his constitutional rights. *Id.* at 1048.  The appellate court concluded that "[a] sheriff cannot be held liable for failing to segregate mental health inmates whom trained medical personnel have concluded do not present a risk of harm to themselves or others." *Id.* at 1050.

Here, Plaintiff does not allege that Defendant Reidy is a supervisor or that he adopted a deliberately indifferent policy or acted pursuant to one.  Rather, Plaintiff alleged that Defendant Reidy personally participated in the alleged constitutional violation. Plaintiff alleged that Defendant Reidy had personal knowledge of Plaintiff's serious medical need, was personally aware that Nurse Thomas refused to treat Plaintiff, and was aware that Plaintiff was left lying on his cell floor, unable to move.

In short, there is a material question of fact whether Defendant Reidy's failure to act was objectively unreasonable in the circumstances and exhibited reckless disregard. *See Gordon*, 888 F.3d at 1125.

As to the fourth and final element, Defendant Reidy argues that there is no causal relationship between his actions and Plaintiff's injury because Plaintiff alleged that his resulting injury—permanent numbness in his left leg—resulted from his fall in his cell that day, not from anything Defendant Reidy did or did not do.  (Doc. 58 at 8.)  But Plaintiff's alleged injuries are not limited to permanent numbness in his left leg.  Plaintiff also alleged injures from lying on the floor of his cell unable to move for eight hours, suffering pain, urinating on himself, and fearing that he was going to die.  (Doc. 59-1 at 3, Reidy Decl. ¶ 8.)

In a constitutional-tort case, "causation is generally a question of fact for the jury." *Arellano v. Melton*, No. 15-cv-2069-JAH-MDD, 2018 WL 4579851, at *4 (S.D. Cal. Sept. 25, 2018) (quotation omitted).  Even if Defendant Reidy did not cause the specific left leg injury that Plaintiff alleged, there are material factual disputes as to whether Defendant Reidy placed Plaintiff in conditions that subjected him to a substantial risk of serious harm and then failed to take reasonable available measures to abate that risk. Because Plaintiff

suffered harm as a result, there is a question of fact as to whether Defendant Reidy's actions—or failure to act—caused Plaintiff's injury. As such, there is a question of fact as to the fourth element.

### D. Qualified Immunity

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230– 32, 235–36 (2009) (courts may address either prong first depending on the circumstances in the particular case). In the qualified immunity analysis, the court must consider all disputed facts in the light most favorable to the nonmovant. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017).

For a right to be clearly established there does not have to be a case directly on point; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2017)). Clearly established law "must be particularized to the facts of the case," and "should not be defined at a high level of generality." *Id.* at 552 (quotation and citation omitted). A right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551).

Once the right at issue is defined, the court must then "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" that right. *Id.* If there is no such case, then the right was not clearly established. *See id.* at 1117–18. "This is not to say that an official action is protected by qualified immunity

unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted). "The Supreme Court has made clear that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (quoting *Hope*, 536 U.S. at 741).

Defendant Reidy argues that, even if a constitutional violation occurred, he is entitled to qualified immunity because there is no caselaw that would have put him on notice that his conduct—relying on Nurse Thomas's assessment—violated Plaintiff's constitutional rights. (Doc. 58 at 9–11.)

It was clearly established at the time that officials other than medical personnel have a duty to protect the health and safety of prisoners. *See Helling v. McKinney*, 509 U.S. 25, 32–33 (1993). It was also clearly established that a non-medical official may be deliberately indifferent if he fails to respond to a prisoner's pain or possible medical need, or if he "knowingly fail[s] to respond to an inmate's requests for help" in obtaining needed medical treatment. *Jett*, 439 F.3d at 1091, 1096. The Ninth Circuit has held that, if a non-medical official chooses "to rely upon a medical opinion which a reasonable person would likely determine to be inferior," his or her actions may "amount[] to the denial of medical treatment, and the unnecessary and wanton infliction of pain." *Hamilton v. Endell* 981 F.2d 1062, 1067 (9th Cir. 1992), *overruled in part on other grounds* (internal quotations omitted).

Finally, numerous district courts in this Circuit, including this one, have applied the holding set forth above that non-medical officers may rely on medical opinions of health care professionals *unless* "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Peterich v. McGree*, No. CV 15-65-BU-BMM-JCL, 2017 WL 9324526, at *6 (D. Mont. March 24, 2017) (internal quotation omitted); *see, e.g.*, *Lopez v. Bollweg*, No. CV 13-00691-TUC-DCB,

2017 WL 4677850, at *6 (D. Ariz. June 26, 2017); *Caplinger*, 999. F. Supp. 2d 1203, 1213 (D. Idaho 2014).

The above caselaw is sufficient to have put Defendant Reidy on notice that, given his knowledge that Nurse Thomas said she didn't care if Plaintiff died and she was not going to do anything, that she conducted only a very cursory evaluation, and that Plaintiff was left lying on his cell floor unable to move, it was unreasonable to rely on Nurse Thomas's inferior medical opinion and that doing so would amount to a denial of medical treatment.  Accordingly, Defendant Reidy is not entitled to qualified immunity, and his Motion for Summary Judgment will be denied.

## V.     Count Three—Excessive Force Claim

### A.     Legal Standard

As mentioned, because Plaintiff was a pretrial detainee at the relevant time, his excessive force claim is governed by the Fourteenth Amendment.  *See Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *Castro*, 833 F.3d at 1067–68.  The standard is purely objective.  *See Kingsley*, 135 S. Ct. at 2473–74; *Gordon*, 888 F.3d at 1124–25; *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 600, 602 (9th Cir. 2019).  The elements that Plaintiff must show to support his excessive force claim are the same as those applied to his medical care claim in Count One: whether Defendant Pina made an intentional decision with respect to Plaintiff's conditions; whether those conditions put Plaintiff at a substantial risk of suffering serious harm; whether Defendant Pina took reasonable measures to abate the risk; and whether Defendant Pina caused Plaintiff's injuries.  *Castro*, 833 F.3d at 1071.

Excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom."  *Smith v. Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (quotation omitted); *see Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) ("the reasonableness of force used is ordinarily a question of fact for the jury"). . . . .

**B.      Relevant Facts**

On July 9, 2022, when Plaintiff was housed at the Pima County Adult Detention Center, he was placed "on disciplinary"; however, he was not moved to the disciplinary pod, and staff did not take his property, which is the custom when someone is placed on disciplinary status.  (Doc. 1 at 11; Doc. 74 ¶ 1 (in part); Doc. 57 ¶ 5.)

On July 11, 2022, Plaintiff was housed in cell 4A in the Administrative Segregation Unit, which had been Plaintiff's permanent housing placement for approximately 1 1/2 years.  (Doc. 74 (in part); Doc. 74-1 at 1, Pl. Decl.)  At that time, Plaintiff was subject to certain security restrictions, which meant that two officers were required to be present at all times when Plaintiff was out of his cell; Plaintiff was required to be handcuffed behind his back, with shackles on his ankles and a hobble chain; and he was generally not allowed to have any sharp materials.  (Doc. 57 ¶ 3; Doc. 74 ¶ 3.)

**1.      Defendant Pina's Version**

On July 11, 2022, Officer Mazzei discovered that Plaintiff had not given up his personal property even though, according to the Disciplinary Housing Unit Post Orders, each morning, each prisoner "will be issued a bag with his name and cell number printed on it.  At [7:00 a.m.] each morning the inmate will be directed to place all of his personal property, bedding into the bag."  (Doc. 57 ¶ 6; Doc. 57-1 at 13.)  Officer Mazzei ordered Plaintiff to give up his personal property and allow a strip search, but Plaintiff refused. (Doc. 57 ¶ 7.)

A short time later, Officer Mazzei returned to Plaintiff's cell with Officer Maldonado and Defendant Pina.  (Doc. 57 ¶ 8.)  The Officers ordered Plaintiff to turn over his property and allow a strip search, but Plaintiff again refused.  (*Id.*)  Defendant Pina then called for a mental health staff member to speak with Plaintiff to try to get him to voluntarily turn over his property and submit to a strip search.  (*Id.* 10.)  Behavioral Health Technician Borboa spoke with Plaintiff for several minutes, but Plaintiff still refused to comply.  (*Id.* ¶ 11.)

A CODE GREEN was called; when a CODE GREEN is called, the Jail's Tactical Assistance Group ("TAG") responds. (*Id.* ¶¶ 12–15.)  The TAG team arrived and ordered Plaintiff to give up his property and allow a strip search. (*Id.* ¶ 17.)  Plaintiff allowed restraints to be placed on him, but he refused to allow a strip search. (*Id.*)  Defendant Pina approved the use of a restraint board, and the TAG team placed Plaintiff on a restraint board, face up, until he agreed to allow a strip search. (*Id.* ¶¶ 18, 22–23.)  While on the restraint board, Plaintiff stated that he "was going to kill an officer the first chance he gets." (*Id.* ¶ 19.)  Plaintiff remained on the restraint board for 1 hour and 50 minutes, until he agreed to a strip search. (*Id.* ¶ 24.)  During this time, Plaintiff's cell was searched, and his personal property was removed. (*Id.* ¶ 18.)

### 2.  Plaintiff's Version

Around 7:00 a.m. on July 11, 2022, Officer Mazzei let Plaintiff out of his cell into the dayroom and searched Plaintiff's cell. (Doc. 74 ¶ 1; Doc. 74-1 at 1, Pl. Decl.)  A couple hours later, around 10:00 a.m., Plaintiff and Officer Mazzei got into an argument. (*Id.*)  As a result, Officer Mazzei ordered Plaintiff to give up his property. (Doc. 74-1 at 1, Pl. Decl.)  Plaintiff refused to give up his property because he was not in disciplinary housing; rather, he was in 4A (administrative segregation), and it is customary not to take the property of prisoners in administration segregation. (*Id.* at 2, Pl. Decl.)

Officer Mazzei then called Defendant Pina, who arrived at the cell with Officer Maldonado. (*Id.*)  Plaintiff was lying down in his cell, and when Officer Maldonado opened the cell door, Plaintiff got up. (*Id.*)  Defendant Pina told Plaintiff to give up his property, but when Plaintiff pointed out that other prisoners had their property, Defendant Pina said he was going to call "Psych." (*Id.*)  Psych staff member Anthony came to Plaintiff's cell door and asked Plaintiff if he would give up his property and "cuff up" prior to the TAG team arriving, and Plaintiff agreed to do so. (*Id.*; Doc. 74 at 2; Doc. 1 at 11.)  Psych Anthony told Defendant Pina that Plaintiff would comply, give up his property, and cuff up, but Defendant Pina said, "it's too late now." (*Id.*)

About 30 minutes later, the TAG team arrived.  (Doc. 1 at 11.)  Plaintiff followed all their directives, and he made no threats.  (*Id.*)  At no time was Plaintiff instructed to submit to a strip search.  (Doc. 74-1 at 2–3 Pl. Decl.)  Nonetheless, Defendant Pina ordered the TAG team to "four-point" Plaintiff on a restraint board.  (*Id.*; Doc. 1 at 11.)  Plaintiff was held on the restraint board for 1 hour and 50 minutes, during which time he was in constant pain throughout his entire body and "mentally tormented."  (Doc. 74 at 2; Doc. 74-1 at 2, Pl. Decl.)

After the incident, Plaintiff suffered pain in his right shoulder as well as mental anguish.  (Doc. 1 at 11.)  Plaintiff's property was subsequently thrown away.  (Doc. 74-1 at 3, Pl. Decl.)

### C.   Discussion

#### 1.   Plaintiff's Motion for Summary Judgment

In his Motion, Plaintiff requests that the Court grant him summary judgment and award damages due to defense counsel's purposeful deceit on the Court.  (Doc. 83 at 1.) Plaintiff states that, although Defendant Pina averred that Plaintiff was let out of the restraint board only when he agreed to a strip search, and that Plaintiff was required to be fully restrained at all times, video footage that he was allowed to watch on March 19, 2024, showed that when he was released from the board, he was allowed to walk into his cell without restraints.  (*Id.* at 1–2.)  Plaintiff also requests that the Court order the pod security video from July 11, 2022, and set a hearing for viewing of the video.  (*Id.* at 2.)  Plaintiff asks that the Court charge Defendant Pina and defense counsel with perjury and issue jail time and monetary sanctions.  (*Id.*)

Defendant Pina opposes Plaintiff's Motion on the ground that it does not meet the procedural or evidentiary requirements for a summary judgment motion, Plaintiff already requested video footage during discovery and Defendants provided all video that was in their possession, and Plaintiff presents no evidence to support his request for sanctions. (Doc. 88.)  Defendant Pina insists the video shows Plaintiff still in restraints when he was removed from the board.  (*Id.* at 4.)

Plaintiff's three-page Motion does not include any supporting evidence, nor does it conform to the Federal or Local Rules of Procedure that govern summary judgment motions. *See* Fed. R. Civ. P. 56; LRCiv 56.1(a). Plaintiff also fails to present any evidence to support his claim that Defendant Pina and defense counsel deceived the Court.

With respect to the request for video footage, the Court notes that no security video footage was submitted by either party. Because the Court is limited to the evidence in the record in its summary judgment analysis, it does not consider either party's assertions as to what the video footage shows.[3]

In light of the procedural and evidentiary deficiencies of Plaintiff's Motion for Summary Judgment, the Motion will be denied.

### 2.    Defendant Pina's Motion for Summary Judgment

There can be no dispute that Defendant Pina made an intentional decision regarding Plaintiff's conditions of confinement. Specifically, Defendant Pina ordered that Plaintiff be placed in four-point restraints on a restraint board. *See Castro*, 833 F.3d at 1070.

The second element considers whether Plaintiff faced a substantial risk of suffering serious harm when he was placed in four-point restraints on a restraint board. When a person is placed into four-point restraints, each limb is affixed to a bed or board. *See Coppola v. United States*, No 1:17cv6, 2018 WL 4677853, at *11 (N.D. W.V. June 26, 2018) ("[i]nmate Coppola was placed in hard four point restraints, where each limb is affixed to the bed"); *Stewart v. Rhodes*, 473 F. Supp. 1185, 1190 (S.D. Ohio 1979) (case challenging "'four-way restraints,' in which the prisoner is chained on his back to a metal bed frame by means of handcuffs and leg irons"). Generally, the use of four-point restraints is considered a form of prison discipline that is a measure of "last resort." *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) ("[i]n our civilized society, we would like to

---

[3] There is no explanation as to why video evidence of the July 11, 2022 encounter, which would be relevant, was not submitted with the summary judgment briefing. *See Rosales v. City of Chico*, No. 2:14-02152 WBS CMK, 2015 WL 6167740, at *9 (E.D. Cal. Oct. 20, 2015) (noting that, "[w]ith allegations of excessive force, video evidence is often the most helpful and relevant evidence").

believe that chaining a human being to a metal bed frame in a spread-eagled position would never be necessary. Unfortunately, it sometimes is. Courts have thus approved the limited use of four-point restraints, as a last resort, when other forms of prison discipline have failed").

Due to the severity of four-point restraints, the Federal Bureau of Prisons must follow specific rules to ensure the health and safety of a prisoner subjected to such restraints, including requiring medical staff to initially assess the prisoner's breathing and make sure the restraints are not restricting or impairing circulation, and providing the prisoner opportunities to use the toilet. 28 C.F.R. § 552.24. The Pima County Sheriff's Department's own policy sets forth requirements for the use of four-point restraints, including that a prisoner in any type of point restraints be evaluated by medical personnel within 15 minutes of restraint application; that there be continuing observation checks for distress, impaired breathing, loss of consciousness, etc.; and that prisoners in restraints be given opportunities for fluid intake and use of restroom. (Doc. 57-1 at 18.) The necessity of special precautions when using four-point restraints supports the inference that there is a risk to prisoners when placed in such restraints; therefore, a reasonable jury could find that the second element in the Fourteenth Amendment analysis is met.

The third element considers whether Defendant Pina took reasonable available measures to avert the risk of harm to Plaintiff. The undisputed facts show that, initially, Defendant Pina took a step to avert the risk by calling in a mental health staff member to speak to Plaintiff and deescalate the situation. Taking Plaintiff's facts as true, this step worked, and Plaintiff agreed to "cuff up" and give up his property. Further, as stated, according to Plaintiff, he was never asked to submit to a strip search. The evidence includes a copy of the Inmate Restraints Check Form, which documents the reason Plaintiff was placed into restraints as "refusing to give up his property." (Doc. 57-1 at 22.) Nothing on the form indicates that Plaintiff refused to submit to a strip search. (*See id.*)[4] Plaintiff

_____

[4] Plaintiff avers that his subsequent Disciplinary Report made no mention that Plaintiff refused to submit to a strip search. (Doc. 74-1 at 2, Pl. Decl.) Plaintiff further avers that nine attending officers' Incident Reports documented that Plaintiff complied

alleged that, despite his compliance, Defendant Pina proceeded to order Plaintiff into the four-point restraints on the restraint board.  Plaintiff claimed that 30 minutes elapsed between the time he spoke to the mental health staff member and agreed to comply and the time the TAG team arrived.  Thus, Defendant Pina's decision to place Plaintiff on the restraint board was not a split-second decision made during a tense or escalating incident.  Rather, Defendant Pina's decision to place Plaintiff on the restraint board came after Plaintiff complied with directives and after significant time elapsed from Plaintiff's initial refusals to comply.

Defendant Pina argues that the use of the restraint board was justified because Plaintiff was on disciplinary status, he had a history of aggravated assaults on staff, he had a history of concealing weapons on his person, and Defendant Pina was aware of Plaintiff's history.  (Doc. 85 at 1–3, 5–6.)  Defendant Pina further argues that, contrary to Plaintiff's allegations, Plaintiff continued to refuse to comply and threatened to kill staff, thereby posing a substantial threat that necessitated the use of the restraint board.  (*Id.*)  The Court must take as true, however, that at the relevant time, Plaintiff complied with all directives, agreed to cuff up and give up his property, did not make any threats, and thus did not pose a threat to others or to himself.  Plaintiff need only present "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose."  *Castro*, 833 F.3d at 1069 (quoting *Kingsley*, 576 U.S. at 398.)  Plaintiff's facts are not unbelievable, and they support that Defendant Pina's conduct was an excessive and disproportionate use of force in the circumstances.  It follows that a reasonable jury could find Defendant Pina did not act as a reasonable official in the circumstances, thereby making the consequences of his conduct obvious.  *See Castro*, 833 F.3d at 1071; *Walker v. Bowersox*, 526 F.3d 1186, 1188 (8th Cir. 2008) (finding that use of a restraint board for punishment as opposed to incapacitation

---

with all directives.  (*Id.* at 2, Pl. Decl.)  Plaintiff avers that none of the Incident Reports— not even Defendant Pina's Incident Report—state that Plaintiff was instructed to submit to a strip search and failed to comply.  (*Id.* at 3, Pl. Decl.)  The Disciplinary and Incident Reports were not submitted by the parties.

may amount to a constitutional violation and that there was a question of fact whether use of a restraint board on a prisoner "was an excessive and disproportionate use of force").

The final element requires a showing that Defendant Pina's failure to take reasonable measures caused Plaintiff's injury. Plaintiff alleged that while he was on the restraint board for almost two hours, he suffered constant pain throughout his body, and afterward, he suffered lasting shoulder pain. (Doc. 74 at 2; Doc. 1 at 11.)[5] Plaintiff also alleged that the incident exacerbated his schizophrenia condition, causing mental torment and fear. (Doc. 74-1 at 2.) Defendant Pina argues that Plaintiff's alleged injuries are de minimis or non-existent and that Plaintiff claims no specific injury to his shoulder, such as a dislocation or broken bone. (Doc. 56 at 10.)

According to Defendant Pina, because Plaintiff cannot establish that he was physically injured, under 42 U.S.C. § 1997e(e), summary judgment is proper on the mental or emotional damages aspect of his claim. (Doc. 56 at 10; Doc. 85 at 7.) Section 1997e(e) of the Prison Litigation Reform Act requires a prisoner to allege a physical injury that is "more than de minimis" in order to pursue claims for mental and emotional injury. *Oliver v. Keller*, 289 F.3d 623, 627–29 (9th Cir. 2002). The Ninth Circuit has held this physical injury requirement applies only to claims for mental and emotional injury, but "[t]o the extent that appellant has actionable claims for compensatory, nominal or punitive damages—premised on violations of his Fourteenth Amendment rights, and not on any alleged mental or emotional injuries—we conclude the claims are not barred by §

---

[5] Defendant Pina argues that the Court should not consider Plaintiff's declaration statement that he suffered pain throughout his body because, in his Complaint, Plaintiff alleged that he suffered from shoulder pain but did not specifically allege that he suffered pain throughout his entire body; thus, Plaintiff's "initial claim of shoulder pain is a judicial admission, which should be considered conclusively binding, to the exclusion of the allegation of pain throughout his entire body." (Doc. 85 at 6.) Plaintiff's allegation in his Complaint that he suffered shoulder pain is not a "judicial admission." At summary judgment, the nonmovant must "go beyond the pleadings" and, by his own sworn statement, designate specific facts supporting that there is a triable issue. *Celotex*, 477 U.S. at 324; *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (pro se litigant may "bolster[] his claim by making more specific allegations . . . in later filings"). Plaintiff's declaration statements regarding the pain he suffered while on the restraint board do not contradict any allegation in his Complaint; rather, they present more specific facts. Accordingly, the Court will consider Plaintiff's averments as to the pain and injuries he suffered.

1997e(e)." *Id.* at 629–30 (even absent physical injury, the prisoner was entitled to seek damages premised on alleged Fourteenth Amendment violations). Here, Plaintiff did not assert a separate claim for mental or emotional injury; rather, he asserted a Fourteenth Amendment excessive force violation. (Doc. 1 at 11.) Therefore, § 1997e(e)'s physical injury requirement to show more than de minimis injury is inapplicable to Plaintiff's claim.

Plaintiff has personal knowledge to testify as to the pain he suffered during and after the restraint board incident. *See S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1070 (C.D. Cal. 2005) (a declarant has personal knowledge of his or her own symptoms). Plaintiff need not suffer significant injury to support his claim. *See Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010) (even under the Eighth Amendment standard, the extent of a prisoner's injury is not decisive because a prisoner can state a claim even if he did not suffer a significant injury); *see also Fields v. Ruiz*, No. 1:03-CV-6364-OWW DLB-P, 2007 WL 1821469, at *7 (E.D. Cal. June 25, 2007) ("[a]n Eighth Amendment conditions of confinement claim does not require an allegation of injury that is more than de minimis"). To the extent Defendant Pina argues that Plaintiff's injuries are insignificant, that may limit possible damages, but it does not defeat his Fourteenth Amendment excessive force claim. *Id.* at 35, 39.

As mentioned, causation is generally a question of fact for the jury." *Arellano*, 2018 WL 4579851, at *4. In light of the material factual disputes as to whether Defendant Pina placed Plaintiff in conditions that subjected him to a substantial risk of serious harm and then failed to take reasonable available measures to abate that risk, there exists a question of fact as to whether Defendant Pina's actions caused Plaintiff's injuries. *See Lemire*, 726 F.3d at 1080–81. The fourth element is, therefore, met.

Based on the above, there exists a triable issue of fact whether Defendant Pina violated Plaintiff's Fourteenth Amendment right against the use of excessive force.

### D. Qualified Immunity

The Court has already determined there is a material factual dispute as to whether Defendant Pina violated Plaintiff's Fourteenth Amendment rights. The qualified immunity

analysis, therefore, turns on the second prong—whether the right at issue was clearly established.

Defendant Pina argues that he is entitled to qualified immunity because there is no caselaw that would have put him on notice "that using a restraint board in accordance with Jail policy with a non-compliant detainee would violate Plaintiffs' Fourteenth Amendment rights." (Doc. 56 at 12.)  Defendant Pina's argument for qualified immunity rests on his version of the facts; namely, that Plaintiff continued to be noncompliant.  (*Id.*; Doc. 85 at 8.)  Because there is a question of fact on this issue, summary judgment based on qualified immunity is not appropriate.  *See Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("[w]here officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate").

Moreover, it was clearly established at the time Plaintiff was placed in four-point restraints on the restraint board that pretrial detainees could not be punished.  *Kingsley*, 576 U.S. at 400 ("pretrial detainees (unlike convicted prisoners) cannot be punished at all"); *Vazquez v. Cnty. of Kern*, 949 F.3d 1153, 1163–64 (9th Cir. 2020) ("the Fourteenth Amendment prohibits all punishment of pretrial detainees") (citation omitted).  *Kingsley* made clear that force used on a pretrial detainee amounts to punishment if the officer's actions "are not 'rationally related to a legitimate nonpunitive government purpose' or . . . the actions 'appear excessive in relation to that purpose.'"  576 U.S. at 398 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538, 561 (1979)).

Taking Plaintiff's facts as true, as the Court must in the qualified immunity analysis, at the relevant time, Plaintiff was compliant and following all directives, yet Defendant Pina declared it was "too late" and ordered that four-point restraints be used.  It was clearly established at the time that this use of force against a pretrial detainee who was not resisting was objectively unreasonable and in violation of the Fourteenth Amendment.  *See Kingsley*, 576 U.S. at 398; *Beavers v. Edgerton*, 773 F. App'x 897, 898 (9th Cir. 2019) (affirming district court's denial of summary judgment as to qualified immunity because it

was clearly established in 1994 that using force on a non-resisting detainee violates their Due Process rights under the Fourteenth Amendment).  Defendant Pina is, therefore, not entitled to qualified immunity, and his Motion for Summary Judgment will be denied.

**IT IS ORDERED:**

(1)  Plaintiff's Motion for Summary Judgment—Oral Argument Requested (Doc. 97) is **denied**.

(2)  Defendant Pina's Motion for Summary Judgment (Doc. 56) is **denied**.

(3)  Defendant Reidy's Motion for Summary Judgment (Doc. 58) is **denied**.

(4)  Plaintiff's Motion for Summary Judgment (Doc. 83) is **denied**.

(5)  The remaining claims are:

(a)  Plaintiff's Fourteenth Amendment medical claim in Count One against Defendants Perko and Reidy;

(b)  Plaintiff's Fourteenth Amendment failure to protect claim in Count Two against Defendant Krause; and

(c)  Plaintiff's Fourteenth Amendment excessive force claim in Count Three against Defendant Pina.

(6)  This action is referred to Magistrate Judge Maria S. Aguilera to conduct a settlement conference.

(7)  Defense counsel shall arrange for the relevant parties to jointly call Magistrate Judge Aguilera's chambers at (520) 205-4630 within 14 days to schedule a date for the settlement conference.

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

(8)     The parties' deadline for filing a Joint Proposed Pretrial Order (*see* Doc. 60) is **extended**.  If the parties do not reach a settlement at the settlement conference before Magistrate Judge Aguilera, the parties shall file a Joint Proposed Pretrial Order within **twenty-one (21) days** of the conclusion of the settlement conference.

**Dated this 26th day of September, 2024.**

_____
Honorable Rosemary Márquez
United States District Judge